**Yvonne B. ALVERIO, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security,[1] Defendant.**

**No. C 94–3002.**

United States District Court, N.D. Iowa, Central Division.

Sept. 15, 1995.

---

1. The function of the Secretary of Health and Human Services in social security cases has been transferred to the Commissioner of Social Security effective March 31, 1995, pursuant to § 6 of the Social Security Independence and Program

Improvements Act of 1994. In accordance with this section, the court has substituted Shirley S. Chater, Commissioner of Social Security, for Donna E. Shalala, Secretary of Health and Human Services, as defendant in this case.

Ronald J. Wagenaar of Legal Services Corporation of Iowa, Mason City, Iowa, for Plaintiff.

Ana M. Martel of the United States Attorney's Office, Northern District of Iowa, Cedar Rapids, Iowa, for Defendant.

## ORDER REGARDING SECRETARY'S DENIAL OF SOCIAL SECURITY DISABILITY BENEFITS

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................... 913
 A. Procedural Background ............................................. 913
 B. Factual Background ................................................ 913
 C. The Court's Jurisdictional Basis .................................... 919
II. ANALYSIS ........................................................ 921
 A. The "Substantial Evidence" Standard ................................ 921
 B. The Polaski Standard and Subjective Pain Credibility Determinations ..... 922
 C. Relative Burdens of Proof .......................................... 922
 1. The ALJ's analysis of physicians' opinions ......................... 923
 2. The ALJ's analysis of Alverio's subjective pain complaints ............ 926
 a. Alleged inconsistencies regarding Alverio's daily activities .......... 926
 b. Alleged inconsistencies regarding Alverio's medical treatment ....... 927
 c. Alleged inconsistencies regarding Alverio's work history ........... 928
 3. The credibility of Joey Van Zomeran ............................... 928
 4. The hypothetical questions ........................................ 929
 D. Relief ............................................................ 930
III. CONCLUSION ...................................................... 930

---

This social security disability case requires the court to probe the employment capabilities of a person suffering from an unusual mental impairment, which displays, as its primary characteristic, the excessive dramatization of one's physical ailments. The mental impairment is histrionic personality disorder. In addition, the plaintiff has alleged a multitude of somatic complaints to accompany her mental deficiencies, based on a somewhat convoluted medical history with several different physicians. However, her mental impairment is her primary problem, and the court is faced with the arduous task of examining the voluminous record and ultimately uncovering the magnitude of plaintiff's mental deficiencies in order to discover if the administrative law judge's decision to deny this plaintiff social security disability benefits was, in fact, a decision supported by substantial evidence.

Plaintiff has appealed the administrative law judge's decision denying plaintiff social security disability benefits. The issue before the court is whether the final decision of the Secretary is supported by substantial evidence on the record as a whole. Specifically, the plaintiff alleges she has impairments which preclude her from performing her past relevant work or any other work that exists in significant numbers in the national economy. On the other hand, defendant argues

that the Secretary has met her burden of showing the existence of jobs in the national economy which plaintiff could perform.

## I. INTRODUCTION

### A. Procedural Background

Alverio filed an application for social security disability benefits on October 1, 1991. (Tr. 14.). Her application was denied initially on December 26, 1991, and after reconsideration on May 6, 1992. An administrative hearing was held concerning this matter on December 10, 1992, after which the ALJ determined Alverio was not disabled and not entitled to social security disability benefits on June 24, 1993. (Tr. 14.). On August 16, 1993, Alverio requested review of the ALJ's decision from the Social Security Administration Appeals Council. (Tr. 9.). On November 27, 1993, the Appeals Council denied Alverio's request and stated that "the [ALJ]'s decision stands as the final decision of the Secretary in your case." (Tr. 5.). Because the Appeals Council's November 23, 1993 letter denying Alverio's request represented the final determination of the Secretary, and because Alverio filed this action on January 20, 1994, there is no dispute that Alverio's complaint was timely filed with this court. Therefore, Alverio is entitled to a review of her case under 42 U.S.C. § 405(g). The court turns next to the factual background of Alverio's case.

### B. Factual Background

The plaintiff in this case is Yvonne Alverio, a 49–year–old woman from Mason City, Iowa, who is five feet, five inches tall and who weighs approximately 145 pounds. Alverio is right-handed and has completed twelve grades of school, including one year spent in some type of special education class. Although Alverio did receive a high school education, a pre-employment test conducted at a small college revealed Alverio had the mental capabilities of a fourth grader. (Tr. 39.). In addition, Alverio has difficulty with reading comprehension, memory recall, and concentration on any task in general. (Tr. 39–41.).

In 1989, Alverio was injured after a fall at work and saw a chiropractor regarding pain in her neck and back from this fall. (Tr. 41.). When the pain in her neck and back did not subside, Alverio quit seeing the chiropractor. In September 1989, Alverio went to the Mental Health Center because she was "having suicidal thoughts." (Tr. 242.). In 1989, she actually attempted suicide by taking a substantial number of pills. (Tr. 48.). Alverio saw Dr. Dan Courtney, a psychologist, who diagnosed her as having histrionic personality disorder. (Tr. 245.). The Diagnostic and Statistical Manual of Mental Disorders defines the diagnostic criteria for histrionic personality disorder as

> [a] pervasive pattern of excessive emotionality and attention seeking, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:
>
> (1) is uncomfortable in situations in which he or she is not the center of attention
>
> (2) interaction with others is often characterized by inappropriate sexually seductive or provocative behavior
>
> (3) displays rapidly shifting and shallow expression of emotions
>
> (4) consistently uses physical appearance to draw attention to self
>
> (5) has a style of speech that is excessively impressionistic and lacking in detail
>
> (6) shows self-dramatization, theatricality, and exaggerated expression of emotion
>
> (7) is suggestible, i.e., easily influenced by others or circumstances
>
> (8) considers relationships to be more intimate than they actually are.

Diagnostic and Statistical Manual of Mental Disorders 657–58 (4th ed. 1994). In addition, Dr. Courtney noted Alverio has difficulty concentrating and utilizing judgment and rapidly loses what abilities she has when pressured or under stress. (Tr. 180.). Furthermore, he also recognized that Alverio has

difficulty working with others in stressful situations. (Tr. 180.).

In February 1991, Alverio saw Dr. Robert Johannsen, a family practitioner, for treatment of diabetes and depression. (Tr. 177.). Johannsen recommended a diet to control her sugar intake and visits to the Mental Health Center to treat her depression. (Tr. 177.). However, Alverio missed her appointments at the Mental Health Center. In addition, she maintained poor control over her diabetes, although she did take one tablet of medicine a day, later escalating to two tablets a day. In March 1991, Alverio again saw Dr. Johannsen, complaining of problems with her nerves, inability to sleep, and depression. (Tr. 177.). Dr. Johannsen prescribed antidepressants and recommended that Alverio see a psychiatrist. On April 8, 1991, Alverio saw Dr. Johannsen because of back pain and depression. (Tr. 176.). Johannsen prescribed no lifting for two weeks and increased her dosage of antidepressants. On April 22, 1991, Alverio saw Dr. Johannsen, claiming a domestic assault occurring on April 21, 1991 aggravated her prior back pain. (Tr. 176.). Dr. Johannsen diagnosed her injury as a soft tissue injury to the neck, relegating her to lifting no more than twenty pounds, but determining it was not necessary at that time to prohibit her from working. In addition, Johannsen ordered x-rays of Alverio's back, and radiologist Schularick diagnosed Alverio as having scoliosis, which is defined as an abnormal lateral curvature of the vertebral column. (Tr. 179.). On May 1, 1991, Dr. Johannsen treated Alverio once again for a neck spasm and arranged for her to wear a soft cervical collar with a splint. (Tr. 176.).

On October 30, 1991, Alverio saw Dr. Mahoney, a family practitioner, for musculoskeletal pain in her neck and back, right leg, and right arm. (Tr. 184–85.). She also complained she was having problems due to standing at work. Dr. Mahoney prescribed Motrin for her and diagnosed her as histrionic. (Tr. 184–85.). Dr. Mahoney commented at this time that he believed she was trying to get out of a difficult job situation and did not like the nature of her work. Also, he felt she just needed a doctor's excuse to obtain unemployment benefits. However, on March 25, 1992, when the Disability Determinative Services Bureau asked him for a professional opinion regarding Alverio's condition, Dr. Mahoney declined to give a professional opinion regarding Alverio's mental problems, claiming at that point he had no "detailed information that would be helpful for the report." (Tr. 196.). Later in November 1992, Dr. Mahoney reiterated that Alverio is histrionic, "which means that she is going to have multiple somatic complaints which are often very difficult to sort out." (Tr. 260.). In addition, he noted, "she seems to be someone who is seeking handouts and very much wants to get on Social Security so that she doesn't have to work." (Tr. 260.). Following Alverio's October 1991 visit to Dr. Mahoney, in November 1991, a radiographic report revealed Alverio had mild degenerative arthritis in her spine.[2] (Tr. 185.).

After applying for disability benefits on October 1, 1991, the Department of Health and Human Services ("HHS") rated Alverio's disability for purposes of evaluating her potential to receive benefits on November 4, 1991. Alverio claimed she had been disabled since August 26, 1991. (Tr. 110.). In its report, HHS determined Alverio was not disabled. (Tr. 108.). Specifically, HHS found that Alverio had no episodes of deterioration in work setting which would cause an individual to withdraw from that situation or to experience exacerbation of signs and symptoms, which might include deterioration of adaptive behaviors. (Tr. 108.). Also, HHS claimed that Alverio seldom suffered from a deficiency in concentration, persistence or pace resulting in failure to complete tasks in a timely manner in workplace or elsewhere. (Tr. 108.). On December 26, 1991, Alverio had exhausted the Rural Outreach amount she had been allowed. (Tr. 194.).

In February 1992, Alverio had continued her treatment at the Mental Health Center,

---

**2.** Mild degenerative arthritis is defined as arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes. Stedman's Medical Dictionary 1584 (26th ed. 1995).

seeing Drs. Courtney and Lassise, a psychiatrist. She was diagnosed as having a histrionic personality, but she was not given antidepressants because the doctors felt the majority of her difficulties were characterological. (Tr. 195.). Alverio continued to suffer from headaches, stomach pain, along with stress due to financial difficulties and relationship problems. (Tr. 195.). In April 1992, Alverio saw Dr. Issak, an ophthalmologist, for her headaches and poor vision. (Tr. 197.). Issak noted that Alverio's visual field showed an irregular constriction, but nothing he could diagnose. (Tr. 197.).

Around late April or early May, Alverio sought treatment at the RENEW Center, a branch of the Mental Health Center. (Tr. 65.). Joey Van Zomeren, a certified mental health instructor familiar with Alverio's case at the RENEW Center, testified at the hearing before the Administrative Law Judge ("ALJ"). (Tr. 65–69.). Van Zomeren noted Alverio attended the RENEW Center sporadically; she had very poor work skills, motor skills, coordination, and productivity; she is unable to sit for long periods of time or to complete basic activities without verbal prompting; she has no community resource skills, e.g. having difficulty filling out forms; she cannot work on any task for longer than fifteen to twenty minutes, although she does attempt to engage in mere socialization and craft activities. (Tr. 65–69).

On July 1, 1992, Alverio saw Dr. Mahoney for pain in her right finger. Mahoney found she had a trigger finger[3] and prescribed a splint for three weeks. (Tr. 256.). Dr. Mahoney also treated Alverio on August 4, 1992, October 20, 1992, November 3, 6, and 17, 1992, December 17, 1992, April 23, 29, 1993, and June 30, 1993. Dr. Mahoney also noted her diabetes was under poor control. In addition, Dr. Mahoney believed because of her histrionic personality, she has multiple somatic complaints that are "difficult to control." Dr. Mahoney concluded she wouldn't do well in work requiring physical exertion because of her multiple somatic complaints. Dr. Mahoney opined that "it was in [Alver-

io's] best interests to go on Social Security at this time. Title 19 should help take care of her health care needs and she should be able to get some sort of work." He further noted "she seems to be someone who is seeking handouts" and that she very much wants to be on Social Security so she doesn't have to work."

On September 26, 1992, Alverio saw psychiatrist Dr. Karayusuf. Karayusuf acknowledged Alverio's physical problems with diabetes and musculoskeletal pain, although he noted that Alverio does tend to be histrionic and has the potential to exaggerate the physical distress she may have. (Tr. 253–55). Nonetheless, considering Alverio's physical limitations, Karayusuf recommended she avoid jobs with prolonged standing. Karayusuf also recognized that Alverio was extremely depressed and sleep-deprived; she possessed a total inability to concentrate and an impairment of recent recall; she has had vague hallucinations, living in fear of the man with whom she lives. (Tr. 253–54.). Karayusuf diagnosed her as having schizo-affective disorder, (Tr. 253–54.), which is defined as

an uninterrupted period of illness during which, at some time, there is either a Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia. During the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms. Symptoms that meet criteria for a mood episode are present for a substantial portion of the total duration of the active and residual periods of the illness. The disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

Diagnostic and Statistical Manual of Mental Disorders 295–96 (4th ed. 1994). Karayusuf recommended that Alverio should be restricted to rather simple, low pressure work where she is not in contact with the public and where she has only very brief, very superfi-

---

**3.** A trigger finger is an affection in which the movement of the finger is arrested for a moment in flexion or extension and then continues with a jerk. Stedman's Medical Dictionary 653 (26th ed. 1995).

cial communications with fellow workers and supervisors. (Tr. 254.). Before receiving vocational rehabilitation, however, Karayusuf determined Alverio needs to have her thinking and depression problems under control. (Tr. 254–55.). He further recommended that she receive outpatient psychiatric treatment and medication to address her mental problems. (Tr. 255.). He noted he doubted Alverio has the capacity to sustain the necessary concentration to meet the requirements of a vocational rehabilitation program at this time. (Tr. 255.). On November 27, 1992, Alverio was denied admittance to the Vocational Rehabilitation program. (Tr. 252.).

At the administrative hearing held on December 10, 1992, Alverio still complained of sharp pain from her neck down the right side of her body to her back, a right trigger finger causing an inability to grip things. (Tr. 41.). In addition, she had problems with numbness in her left fourth finger, as well as problems with hand dexterity in both hands. (Tr. 43, 45–46.). She alleged she can lift only five pounds with her right hand, (Tr. 46), and she can stand for only twenty minutes before she begins to lose her balance. (Tr. 43–44.). She asserted she can only sit a half-hour before the pain in her right side becomes unbearable, and she is unable to bend over without sharp pain down her back. Ibuprofen does not cause the pain to subside. (Tr. 42.). She claimed that on December 9, 1992, her leg gave out after walking only two blocks. (Tr. 45.). In addition, she alleged she had pain in both ankles; therefore, she has trouble climbing stairs. (Tr. 47.). Furthermore, she can no longer afford medical treatment because she has reached her limited amount through the Rural Outreach program. (Tr. 194.).

Regarding her daily activities, she only does chores she feels are absolutely necessary, but she works at her own pace and rests as necessary, e.g. vacuuming for twenty minutes and then resting because of sharp pains in her back. (Tr. 51.). She gets help from others when lifting things or doing laundry. She is able to feed, dress, and bathe herself, although she experiences dizziness when getting in and out of the bathtub. She ties her shoes by placing one foot on the couch at a time because of the pain she experiences upon bending over. (Tr. 47.). She lives with a friend, but spends most of the day alone. She takes the bus to go to the grocery store and department stores as needed. (Tr. 52.). In addition, she smokes three to four cigarettes per day.

Regarding her work history, she has held several jobs from which she was terminated. She worked at Marshall & Swift, hanging and handling clothes, but she was terminated after one month because of her inability to concentrate. (Tr. 53.). She also worked as a chicken deboner, but she was terminated after only a few months because she was not a fast enough worker due to her trigger finger and due to her inability to concentrate. (Tr. 54.). She also worked at Subway but was subsequently fired because she had problems handling the cash register, dealing with pressure, and concentrating. (Tr. 54.). At one point, her inability to concentrate caused her to cut herself with a knife without even realizing she had done so. In addition, she worked at Taco Tico, but she was terminated because she could not handle her supervisor pressuring her and was experiencing severe head and back pain after a fall at work. (Tr. 55.). She also worked as a maid, but she was terminated from this job as well because of her back pain and inability to do her job. (Tr. 55.). Alverio has held other jobs from which she was terminated because of her lack of concentration. (Tr. 56.).

Jack Reynolds testified as a vocational expert at the administrative hearing. First, the administrative law judge asked Reynolds to classify the stress level associated with each of Alverio's past relevant jobs, using a scale from one to ten, with "1 being similar to assemble work without production quotas, and 10 being similar to a busy waitress during a rush hour, or an air traffic controller." (Tr. 75.). Reynolds classified all of Alverio's past work between a four and a five on the ALJ's scale. (Tr. 75.). The ALJ proceeded to pose several hypotheticals to Reynolds. Specifically, the following exchange occurred between the ALJ and Reynolds:

Q. . . . I'd like you to assume that we're talking about a female, who by regulatory definition is a younger individual, high

school level education, and past relevant work as per our Exhibit 59. By way of impairments we are talking about a medically ascertainable muscular skeletal impairment manifested by complaints of pain involving the neck, the back, and the right side, as well as the right elbow. Additionally we're talking about diabetes melitis, complaint of poor eyesight, a medically ascertainable neuropsychiatric disability which has been variously diagnosed, and a notation of a trigger finger involving the third finger of the right hand. Now, as a result of this combination of impairments, the medication or the treatment prescribed the claimant has the physical and mental capacity to perform work related activities except for the following: In that there should be provision for limitations of memory and concentration to such extent that the work be on a simple routine and repetitive in character, and that the pace be no more than regular. In other words, no accelerated pace work. There should be provision for only occasional contact with the public. Additionally on a, as I've indicated, utilizing a stress scale from 1 to 10, the stress level should be no greater than a 1 to 5.... All right, with respect to the right hand which is the major upper extremity there should be no utilization of the hand controls with that. Do you understand these elements of the first hypothetical?

A. No, I was wondering if you could elaborate somewhat on the use of the hand controls. Are we talking about gripping actions, or ...

Q. We're talking about any, any sort of job as an integral part of that job would require regular use of the control of some sort. You know, I'm thinking of assembly line where you, you'd pull a press or anything that would, as a matter of course, require the use of a hand control. Does that help?

A. Yes, that helped.

Q. All right, based on this first hypothetical, would the claimant be able to perform any job in her past relevant work either as she performed it, or as performed in the national economy?

A. I would say that there would, ... remain two jobs in the past relevant work that would meet with this hypothetical. One would be the donut machine operator, the other would be the housekeeper in a motel.

Q. Why did you eliminate the other positions?

A. The cook I would eliminate because of the simple routine, repetitive nature of the hypothetical, and I believe a cook would be a non-simple routine type of job. Poultry—would be a constant use of the right hand with a knife, thus the use of hand controls I would eliminate due to that limitation. The deli cutter slicer I would eliminate for the same reason as the poultry ... And the fast food worker would have contact, more than occasional contact with the public.

Q. Now, how would your answer be affected, Mr. Reynolds, if I would further restrict the hypothetical, and also say there should only be occasional contact with co-workers and supervisors?

A. I would, I would say the housekeeper, motel maid would still remain. I believe the donut machine operator due to the proximity of the area where the job is performed is going to have more than occasional contact with supervisors and co-workers. It generally is performed in a confined area around other, other workers. But the housekeeper, motel maid would still remain after this hypothetical.

Q. If I were to further restrict the hypothetical and say that there should be no requirement for repetitive gripping with the right hand, and also lower the stress level to a four, how does that impact on your answer?

A. I would say the housekeeper job would still remain with this hypothetical.

Q. All right, Mr. Reynolds, for the next hypothetical I would like to put us in a light category and basically limit lifting to 20 pounds, with a repeated maximum lift of 10 pounds provided there should be no more than an occasional stooping, kneeling, or crawling requirement. No ability to, no requirement to climb, and again lower the stress level at this time to a level 3. Does,

would this preclude the return to past relevant work as housekeeper?

A. No, I don't believe it would. I believe the job could still be performed with additional limitations.

Q. Let us hypothetically say that this position were not available. If we do have one of her positions, ... cook ... semi-skilled. Would the restrictions of my fourth hypothetical preclude any transferability of skills?

A. Am I to assume that all the previous limitations would remain?

Q. All the limitations remain.

A. Yes, there would not be any transferability of skills.

Q. All right, would the restrictions of this hypothetical for all the limitations that I've given you, would they preclude unskilled work of the light or sedentary nature?

A. There would remain limited occupations of an unskilled, light, and sedentary nature ... such as a laundry sorter, a microfilm camera operator, or a newsprint inserter. I believe that these jobs would still meet with the hypothetical. The laundry sorter is DOT code 361.687–014 with 400 jobs in Iowa, 28,000 jobs nationally. The microfilm camera operator is DOT code 976.682–022 with 250 jobs in Iowa, 1 and 50,000 jobs nationally. And the newsprint inserter is DOT code 920.587–018 with 500 jobs in Iowa, and 70,000 jobs nationally. And then I would also say the, as I stated before the housekeeper would remain under the hypothetical.

Q. All right. If by way of the fifth hypothetical that I were to provide that the pace had to be slow, would there still be a possibility for return to her past relevant work?

A. No, I believe if that were added to the previous hypotheticals it would eliminate past relevant work, and would eliminate any type of competitive employment.

(Tr. 75–80.). Alverio's attorney, Ronald Wagenack, asked the vocational expert some follow-up questions regarding the judge's hypotheticals. The exchange continued as follows:

Q. ... You had talked about the house-keeper job, and these other three jobs. First, I guess, just for my lack of knowledge in these particular jobs, could you tell me what, what would be involved in the three jobs that you listed as a laundry sorter, the electric ... camera operator, and the newsprint inserter?

A. ... they are very routine, repetitive type jobs. Laundry sorter, someone that would sort laundry as according to color, how it's to be handled in a laundry setting, type of fabric, color, so they would sort it for processing. Microfilm camera operator would take documents that are to be microfilmed, place them under a camera, engage the camera, and that would be a constant repetitive process of operating the microfilm camera. A newsprint inserter would take the three to four sections that would come in a newspaper and insert each one of those sections into the other to form a completed newspaper, and then stack the completed newspaper for shipping.

Q. Now, one of the restrictions listed earlier was no repetitive gripping with the right hand. Are you saying that these would not require repetitive gripping with the right hand?

A. It would require repetitive, I would say the, it would require use of the right hand. I would not call it repetitive gripping. It would require fine manipulation of the right hand. The ability to pick up a piece of paper, the ability to pick up a section of a newspaper, the ability to pick up a section of a newspaper, or an article of clothing, and be able to handle those objects. But as I interpreted the hypothetical, repetitive gripping and the difference between repetitive fine manipulation are two different things.

Q. I guess for my understanding, how would you distinguish between the two then? When is it grip, and when is it fine manipulation?

A. I think your grip would be something of a, that would require more than a few ounces, or less than a pound to pick up. More than, more than a few ounces or a pound would be considered gripping, as

[opposed] to picking up a paper clip or picking up a piece of paper.

Q. So if we, instead of saying no repetitive gripping, state no repetitive fine manipulation of the right hand, how would that affect those three jobs?

A. ... I would say that it would eliminate the jobs. I, I believe a person with all of the limitations we've listed up to this point in time, and then add on fine manipulation would, would effectively be eliminated from any type of employment.

Q. Okay, even the housekeeping job?

A. Yes.

Q. Now, again going back prior to the ... where we still have these other four jobs listed especially with regard to the housekeeping job, if the hypothetical changed to no more lifting than five pounds, how would that affect those jobs that you had indicated, the housekeeper job, ... three unskilled jobs?

A. If the maximum lifting was 5 pounds ...

Q. Correct.

A. ... that would eliminate any type of competitive employment.

Q. What about if the claimant was limited to standing for a maximum of 20 minutes without having to sit down and rest for a period of time, perhaps 20 to 30 minutes?

A. If that were added it also would eliminate competitive employment.

Q. Also, with regard to the housekeeping job, I believe that one of the hypotheticals had occasional stooping, kneeling, and crawling. What if the hypothetical instead had said no bending or kneeling, how would that affect the ability to return to the housekeeping job?

A. With no bending, stooping, kneeling?

Q. Correct.

A. I would say with no bending they could not perform, the individual could not perform light employment which these are all considered light employments that would not be able to return to any of the jobs that I have listed.

Q. Okay, the last thing I believe that I would include, again the four jobs that are still in the picture, how would an individual who could stay on task for a maximum of 30 minutes, and then no longer maintain the concentration to remain on task, and also who needs constant reminding in order to follow through with appointments with duties, how would that affect those four jobs?

A. Well, first of all, if they couldn't stay on task for more than 30 minutes they would, they would be considered unemployable. The second part, I'm not sure I, I follow what you're saying there.

Q. Okay, an individual who, because of concentration difficulties, constantly needs to be reminded either about her job duties, or there's testimony about that she was forgetting appointments, that she has to be reminded about appointments, just as an example, okay that she needs the constant reminding. An individual in a work situation where an individual needs constant reminding of the job duties that she's required to do, how would that affect her employment under this hypothetical?

A. I don't see an individual that needed constant supervision, constant reminding being competitively employed. Only in a sheltered work situation would you find that type of supervision.

(Tr. 80–83.).

In his decision, the ALJ concluded that Alverio does not have an impairment or combination of impairments which prevent her from performing her past relevant work or any other work that exists in significant numbers in the national economy. Furthermore, the ALJ found that Alverio was "not disabled," as defined in the Social Security Act. With this factual background in mind, the court will now review its jurisdictional basis for hearing this case and then analyze the ALJ's ruling.

### C. The Court's Jurisdictional Basis

In *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the United States Supreme Court described the procedural steps leading up to a district court's review of Social Security appeals as follows:

The initial disability determination is made by a state agency acting under the authori-

ty and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 CFR §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered *de novo* by the state agency. §§ 409.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 CFR §§ 404.929, 416.1429, 422.201 *et seq.* (1986). Third, the claimant may seek review by the Appeals Council. 20 CFR §§ 404.967 *et seq.*, 416.1467 *et seq.* (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court.

*Yuckert,* 482 U.S. at 142, 107 S.Ct. at 2291.

Section 1383(c)(3) of Title 42 of the United States Code provides that "(t)he final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title...." In pertinent part, 42 U.S.C. § 405(g) states the following:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modify-

ing, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions....

42 U.S.C. § 405(g) (Supp.1995).

Accordingly, the court has the power to affirm, reverse or remand the ALJ's decision, and "(w)here the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir.1992) (citing *Fowler v. Bowen,* 866 F.2d 249, 253 (8th Cir.1989)); *see also Simmons v. United States R.R. Retirement Bd.,* 982 F.2d 49, 57 (2d Cir.1992) (citing *Thompson,* 957 F.2d at 614; *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversal proper where remand "would serve no purpose")); *Gavin v. Heckler,* 811 F.2d 1195, 1202 (8th Cir.1987) (reversal proper where "remand would be a futile gesture"). The court, however, cannot grant a remand merely because it is unhappy with the ALJ's result, *Melkonyan v. Sullivan,* 501 U.S. 89, 100–01, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991), or " 'because substantial evidence would have supported an opposite decision.' " *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (quoting *Smith v. Shalala,* 987 F.2d 1371, 1374 (8th Cir.1993) in turn quoting *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984)). Further, in order to remand a case such as this one, which falls under sentence four of 42 U.S.C. § 405(g),[4] the court must either affirm, modify or reverse the decision so that it will be considered a final judgment. *Melkonyan,* 501 U.S. at 101, 111 S.Ct. at 2163; *see also Shalala v. Schaefer,* — U.S. ——, ——, 113 S.Ct. 2625, 2627, 125 L.Ed.2d 239 (1993) (holding "a district court remanding a case pursuant to sentence four of § 405(g) must order judgment in the case and may not retain jurisdiction over the ad-

---

**4.** Sentence four of § 405(g) provides that:

The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C.A. § 405(g) (pocket part 1994).

ministrative proceedings on remand."). With this jurisdictional basis in mind, the court now turns to the standards to be applied upon review.

## II. ANALYSIS

### A. The "Substantial Evidence" Standard

The Eighth Circuit's standard of review in Social Security cases is well-established. This court must affirm the findings of the ALJ if they are supported by substantial evidence in the record as a whole. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir.1994) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir.1992) (citing *McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983)); 42 U.S.C. § 405(g). " 'Substantial evidence is less than a preponderance' ..." *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (quoting *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992)), but " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Perales,* 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see also Smith,* 31 F.3d at 717 (citing *Ghant v. Bowen,* 930 F.2d 633, 637 (8th Cir.1991)); *Metz v. Shalala,* 49 F.3d 374, 376 (8th Cir.1995). Put another way, "(t)he standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.' " *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (quoting *Turley v. Sullivan,* 939 F.2d 524, 528 (8th Cir.1991), which, in turn, quoted *Bland v. Bowen,* 861 F.2d 533, 535 (8th Cir.1988)).

When evaluating the evidence in an appeal from the Secretary's denial of benefits, the court must perform a balancing test, evaluating any contradictory evidence. *Sobania v. Secretary of HHS,* 879 F.2d 441, 444 (8th Cir.1989) (citing *Gavin,* 811 F.2d at 1199). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [this court] must affirm the [Secretary's] decision." *Orrick,* 966 F.2d at 371; *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). Even if this court "might have weighed the evidence differently, [it] may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome." *Culbertson,* 30 F.3d at 939 (quoting *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). In other words, the court "must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. [The court] may not, however, reverse the Secretary's decision merely because substantial evidence also would have supported an opposite decision." *Frankl,* 47 F.3d at 937 (citing *Smith,* 987 F.2d at 1374 (8th Cir.1993)).

"Review under this standard is not a rubber stamp for the ALJ, however," *Griffon v. Bowen,* 856 F.2d 1150, 1153 (8th Cir.1988) (citing *McMillian,* 697 F.2d at 220). The court must at all times keep in mind that prior to granting or denying benefits, the ALJ has a duty to fully and fairly develop the record. This mandate was recently summarized as follows:

> The Secretary acknowledges that it is her " 'duty to develop the record fully and fairly, even if ... the claimant is represented by counsel.' " *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dep't of Health & Human Serv.,* 13 F.3d 359, 361 (10th Cir.1993) (citing *Dixon v. Heckler,* 811 F.2d 506, 510 (10th Cir.1987)). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based."

*Battles v. Shalala,* 36 F.3d 43, 44–45 (8th Cir.1994) (quoting *Higbee v. Sullivan,* 975 F.2d 558, 562 (9th Cir.1992) (per curiam)). With these standards in mind, the court will now turn to the ALJ's evaluation of Alverio's case.

### B. The Polaski Standard and Subjective Pain Credibility Determinations

"An ALJ's credibility determinations are, of course, entitled to considerable weight." *Young v. Secretary of Health and Human Servs.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir.1987)); *see also Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988); *Hardaway v. Secretary of Health and Human Servs.,* 823 F.2d 922, 928 (6th Cir.1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit subjective complaints of pain only if they are inconsistent with the record as a whole. *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322, *supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)). Under *Polaski,*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski,* 739 F.2d at 1322. In other words, under *Polaski,* an ALJ is free to doubt a claimant's subjective pain complaints. How-

ever, he must support a denial of benefits based on a consideration of the above-mentioned five factors. Indeed, the *Polaski* court stated that "(t)he adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (emphasis in original).

As the Tenth Circuit has stated, "(t)o establish disabling pain without the explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony evaluated by the ALJ and weighed alongside the medical evidence." *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988) (citing *Luna v. Bowen,* 834 F.2d 161, 165 (10th Cir.1987)); *see also Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.1986); *Avery v. Secretary of Health and Human Servs.,* 797 F.2d 19, 21 (1st Cir.1986); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986); *Green v. Schweiker,* 749 F.2d 1066, 1070 (3d Cir.1984).

### C. Relative Burdens of Proof

A "disability" is defined in 42 U.S.C. § 423(d) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (1994). A disability is found when a claimant is "not only unable to do his previous work but cannot, considering ... his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A) (1994).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl,* 47 F.3d at 937 (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th

Cir.1993)); *see also Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir.1995) (citing *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)); 20 C.F.R. § 404.1512(c); *see also Johnston v. Shalala,* 42 F.3d 448, 451 (8th Cir.1994). "If met, the burden of proof then shifts to the Secretary to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience." *Frankl,* 47 F.3d at 937 (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc); 20 C.F.R. §§ 404.1520(f), 416.920(f)). *See also Johnston,* 42 F.3d at 451 (citing *Turpin v. Bowen,* 813 F.2d 165, 170 (8th Cir.1987); *Hajek v. Shalala,* 30 F.3d 89, 93 (8th Cir. 1994) (citing *Evans v. Shalala,* 21 F.3d 832, 835 (8th Cir.1994)); *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994); *Smith,* 31 F.3d at 717 (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991); *Hajek,* 30 F.3d at 93 (citing *Evans,* 21 F.3d at 835); *Walker v. Shalala,* 993 F.2d 630, 632 (8th Cir.1993) (citing *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir.1992)); *Reed v. Sullivan,* 988 F.2d 812, 814 (8th Cir.1993)); *Edwards v. Secretary of Health and Human Servs.,* 809 F.2d 506, 507 (8th Cir.1987); *McCoy v. Schweiker,* 683 F.2d at 1142.

The ALJ determined that there were a "significant number of jobs in the national economy which [Alverio] could perform." (Tr. 21.). Therefore, the ALJ found that Alverio was not disabled within the definition of 42 U.S.C. § 405(g). The issue for the court is whether the ALJ's decision was supported by substantial evidence. To make this determination, the court will review the ALJ's order and the record as a whole.

### 1. The ALJ's analysis of physicians' opinions

In his decision, the ALJ reviewed the medical evidence and determined that "it is [Alverio's] mental impairments that are her primary impairments." (Tr. 18.). The ALJ acknowledged Alverio "has a history of depression variously diagnosed as an adjustment disorder with mixed emotional features, major depression, and schizoaffective disorder as well as a histrionic personality disorder. Treatment has consisted of episodic antidepressant medications and sleeping aid medications. The claimant denies her sleep has improved with these medications and sleeping aid medications." (Tr. 18.). However, the ALJ found that, despite her mental impairments, Alverio was capable of employment. (Tr. 18.). The ALJ made this finding largely on the opinions of Alverio's treating psychiatrist, Dr. Lassise, and treating psychologist, Dr. Courtney, both of whom alleged Alverio was capable of employment. The ALJ noted that Dr. Courtney recognized Alverio's periods of considerable difficulty with concentration and judgment, but nonetheless, believed Alverio was capable of employment. (Tr. 18.). The ALJ further found that Dr. Lassise felt the majority of Alverio's problems were characterological and denied her request for antidepressants. (Tr. 18.).

In addition, the ALJ recognized that Alverio underwent a psychiatric evaluation with Dr. Karayusuf in September 1992, after she had seen both Drs. Courtney and Lassise. The ALJ found that

[a]lthough Dr. Karayusuf initially felt the claimant had a schizoaffective disorder, after reviewing records of [Alverio]'s treating psychologist and treating psychiatrist, he deferred to their [mutual] opinion [that Alverio] had depression and a histrionic personality disorder. Despite these impairments, however, Dr. Karayusuf felt the claimant was capable of doing simple low pressure work where she was not in contact with the public and had only very brief very superficial communications with fellow workers and supervisors. He also noted Alverio had potential to exaggerate any physical distress she might be having.

(Tr. 18.). Also, the ALJ noted Alverio's family physician, Dr. Mahoney, acknowledged that Alverio's diabetes was under very poor control, she had a trigger finger, she suffered from depression, and she had a histrionic personality disorder. Nonetheless, Dr. Mahoney characterized Alverio as "an individual seeking handouts and that it would not be in her best interests to be on disability." (Tr. 19.). Therefore, based on this analysis, the

ALJ concluded that the objective medical evidence regarding Alverio's mental impairments did not support Alverio's claim of disability.

The court is aware that its analysis of the ALJ's evaluation of the objective medical evidence is limited. *See Chamberlain v. Shalala,* 47 F.3d 1489, 1494 (8th Cir. 1995). Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician. *Id.; see also Matthews v. Bowen,* 879 F.2d 422, 424 (8th Cir.1989) (citing *Ward v. Heckler,* 786 F.2d 844, 846 (8th Cir.1986)). On the other hand, a treating physician's opinion is "not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data." *Id.* In addition, the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements. *Chamberlain,* 47 F.3d at 1494; *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir.1994) (citing *Thomas v. Sullivan,* 928 F.2d 255, 259 (8th Cir.1991)).

Here, the ALJ considered Drs. Courtney and Lassise to be Alverio's treating psychologist and psychiatrist and focused his opinion on their claims that, despite Alverio's problems, she was capable of employment. However, Dr. Courtney also qualified his statement, noting that Alverio is limited in the degree of pressure she can tolerate and that Alverio rapidly loses judgment and concentration when pressures mount. (Tr. 180.). In addition, Dr. Courtney relayed Dr. Lassise's opinion that Alverio's difficulties were largely characterological. (Tr. 195.). Dr. Courtney himself noted that at his most recent visit with Alverio before the hearing, she found it very difficult to focus on any skill development to better cope with the stresses she was experiencing, and she was agitated that the doctors would not prescribe antidepressants to help her cope with the pain from her other medical problems. (Tr. 195.). Also, Dr. Courtney noted Alverio was experiencing "considerable financial difficulty and relationship problems," (Tr. 195.), although the ALJ stated Dr. Courtney said Alverio's problems stemmed primarily from financial and relationship stressors. (Tr. 18.).

Furthermore, although Dr. Karayusuf acknowledged Alverio should be limited to simple, low pressure work environments with no contact with the public and where she has only very brief, very superficial communications with fellow workers and supervisors, he also stated that before Alverio underwent any vocational rehabilitation, she must get her thinking and depression problems under control. (Tr. 254–55.). To obtain this goal, he recommended that Alverio receive outpatient psychiatric treatment and medication. (Tr. 254–55.). Also, he articulated his doubt that Alverio has the capacity to sustain the necessary concentration and follow through to keep up and meet the requirements of a job rehabilitation program. (Tr. 254–55.). The ALJ apparently disregarded Dr. Karayusuf's opinion regarding her psychiatric state and need for treatment before embarking on vocational rehabilitation. Rather, the ALJ focused on Dr. Karayusuf's deference to Drs. Courtney and Lassise's ultimate diagnosis of histrionic personality disorder and depression, and his remark that Alverio tended to be histrionic in presentation and has the potential of exaggerating the physical distress she might have. (Tr. 254–55.). Dr. Karayusuf did in fact consider depression and histrionic personality disorder to be the primary diagnosis; however, Karayusuf reiterated his opinion that "her psychiatric state is unstable enough at this time, with the vague symptoms of hallucination, and the fact that she appears to have some loosening of associations at times, that she needs to be involved in treatment for this before embarking on a rehabilitation program. Again, she would do best in jobs that do not require contact with the public." (Tr. 258–59.).

Although Drs. Courtney and Lassise are the treating physicians, their statements, in light of Dr. Karayusuf's comments and recommendations upon seeing Alverio at a later date, do not necessarily appear to be contradictory to Dr. Karayusuf's opinion; rather, Dr. Karayusuf's opinion supplements the two doctors' prior diagnosis. Although Drs. Courtney and Lassise cited that Alverio may be capable of employment, they qualified their statements to indicate that she could only handle employment where no pressure

existed as her ability to concentrate and her judgment rapidly decreases when pressures mount. In October 1991, Dr. Courtney said she appeared to be doing well with these deficiencies "at the present time." (Tr. 180.). However, in September 1992, Dr. Karayusuf felt her concentration and ability to follow through with any task was so poor that Alverio should not attempt to undergo any kind of vocational rehabilitation until she received the necessary treatment, and the vocational rehabilitation counselor, Richard Rauzi, acquiesced in this opinion. (Tr. 252.). Although Karayusuf did recommend that she may be able to handle a simple, low pressure job in which she had no contact with the public, he opines that she is still very unstable and should likely seek treatment before undergoing any form of job rehabilitation.

The ALJ has a duty to fully and fairly develop the record. *See Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir.1994). Dr. Karayusuf's opinion regarding Alverio's condition and the necessity for treatment prior to job rehabilitation indicates that she needs to undergo this treatment before she is capable of handling the daily stresses and demands of the world of employment. However, he also mentions that she is a person who should be limited to simple, repetitive tasks with supervision and very limited contact with the public. The court is not persuaded Dr. Karayusuf meant that Alverio should not seek treatment before entering the work force once again. If there is an ambiguity in Dr. Karayusuf's recommendation regarding Alverio, the ALJ has a duty to develop the record in this respect, especially considering his opinions are relatively consistent with those of Drs. Courtney and Lassise and that he saw Alverio several months after Drs. Courtney and Lassise. However, here the ALJ disregarded the testimony of Dr. Karayusuf regarding his recommendations and instead hitched his analysis to Dr. Karayusuf's deference in Alverio's diagnosis and an isolated remark regarding her condition.

Furthermore, Dr. Karayusuf's isolated statement regarding Alverio's histrionic nature and her potential to exaggerate her symptoms of physical distress should not automatically cause the ALJ to discredit Alver-

io's claim of disability or her complaints of pain. *See Wheat v. Heckler*, 763 F.2d 1025, 1030 (8th Cir.1985). In *Wheat*, the ALJ discredited the claimant's complaints of pain because the doctor's report stated the claimant, who had been diagnosed with histrionic personality disorder, exaggerated his symptoms. *Id.* The court held the ALJ cannot reasonably discredit the claimant's complaints of pain merely because a doctor states he exaggerated his symptoms. *Id.* The court elaborated, noting the claimant's tendency to exaggerate his symptoms, if he, in fact, has such a tendency, could likely be a symptom of his impairment, histrionic personality disorder, "rather than a deliberate attempt to overstate his symptoms in order to malinger." *Id.* Similarly, in this case, the ALJ cannot reasonably discredit Alverio's complaints of pain or validity of her disability claim merely because Dr. Karayusuf noted Alverio's potential to exaggerate her physical symptoms. Alverio's alleged tendency to exaggerate her physical symptoms could merely be a symptom of her mental impairment, which the ALJ has conceded is her primary impairment. Therefore, the court is not persuaded that this comment discredits Alverio's subjective pain complaints or necessarily reflects upon the validity of her claim of disability.

Moreover, the ALJ cites Dr. Mahoney's opinion, in which he remarked that Alverio seemed to be a woman who was seeking handouts and that it would not be in her best interests to receive disability, as evidence that Alverio's claim of disability is not credible. Dr. Mahoney treated Alverio for diabetes, her right trigger finger, and other acute illnesses, not her mental impairments, although he did conclude, based on his visits with her, that she had a histrionic personality. The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements. *Chamberlain*, 47 F.3d at 1494; *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir.1994) (citing *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991)). As Dr. Mahoney did not undergo a psychological or psychiatric evaluation of Alverio, Mahoney's statement that Alverio appears to be a woman looking for handouts is merely a conclusory statement and, therefore, should

not be given a significant amount of weight. Furthermore, in March 1992, Dr. Mahoney stated he could not give a professional opinion on Alverio's mental state. Also, in a report dated July 15, 1993, Dr. Mahoney gives an opinion, but appears to back down from his prior harsher assessment, stating "[m]y assessment of Yvonne Alverio is that she has significant social problems and is not very interested in pursuing employment, more for those reasons than any physical reasons." (Tr. 265.).

Although Drs. Courtney and Lassise noted that at the time they treated Alverio she seemed capable of employment, they also recognized that her inability to concentrate and her judgment rapidly declined when she was faced with pressure situations. Dr. Karayusuf recognized these same problems and found Alverio to be very unstable, prescribing outpatient psychiatric treatment and medication before Alverio attempted to undergo any plan of job rehabilitation. The court opines that Dr. Karayusuf, who is the most recent psychiatrist to evaluate Alverio's mental state, intended to recommend that Alverio seek treatment before seeking employment. Therefore, the court concludes the ALJ erred in failing to give this recommendation its appropriate consideration and weight, or in the alternative, if the ALJ believed there was an ambiguity or inconsistency in what Dr. Karayusuf had recommended, he should have developed the record. Therefore, based on the above analysis of the ALJ's findings and the inconsistencies within Alverio's doctors' opinions and reports, the court is not convinced that the objective medical evidence supports a finding that Alverio is not disabled.

### 2. The ALJ's analysis of Alverio's subjective pain complaints

Even if the court was persuaded that the medical evidence does not support Alverio's claim of disability, under *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir.1994), this is only half of the analysis. The ALJ must also evaluate the subjective testimony of Alverio and her witnesses before deciding on whether Alverio is, in fact, disabled. *Ricketts v. Secretary of Health and Human*

*Servs.,* 902 F.2d 661, 664 (8th Cir.1990) (citing *Smith v. Heckler,* 735 F.2d 312, 317 (8th Cir.1984), in turn citing *Basinger v. Heckler,* 725 F.2d 1166, 1169–70 (8th Cir.1984) ("a failure to make credibility determinations concerning [the subjective testimony of the family and others] requires a reversal and remand")). In this case, the ALJ found Alverio and her witness were not credible and thus ruled that Alverio was not disabled. The court will, therefore, review the ALJ's decision and the record to determine whether the ALJ's credibility determinations were supported by substantial evidence as a whole.

#### a. Alleged inconsistencies regarding Alverio's daily activities

The ALJ alleges Alverio's daily activities are inconsistent with her allegations of a disabling right trigger finger and left hand numbness. (Tr. 19.). The ALJ notes that Alverio is "up for a full day arising at 9:00 in the morning and retiring at 10:00 in the evening," takes no naps, and spends her day performing chores including vacuuming for short periods of time, doing the laundry with assistance, and grocery shopping. (Tr. 19.). The ALJ further acknowledged that Alverio takes the bus to grocery shop, attends the RENEW Center to socialize, and is able to feed, bathe, and dress herself. (Tr. 19.). Finally, the ALJ found that Alverio earlier had reported doing yard work and washing the windows from the outside daily, as well as doing embroidery, playing cards, and cooking. (Tr. 19.).

Before addressing these alleged inconsistencies, the court recognizes that, under Eighth Circuit case law, a "disability" under the Social Security Act does not mean total disability or exclusion from all forms of human and social activity. *Harris v. Secretary of the Dep't of Health and Human Servs.,* 959 F.2d 723, 726 (8th Cir.1992) (claimant's ability to cook, shop, clean, do laundry and visit friends does not constitute substantial evidence that claimant can engage in substantial activity)). "[A] claimant need not prove that he or she is bedridden or completely helpless to be found disabled." *Payton v. Shalala,* 25 F.3d 684, 687 n. 6 (8th Cir.1994) (citing *Thomas v. Sullivan,* 876

F.2d 666, 669 (8th Cir.1989)). "In order to find that a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which people work in the real world." *Payton,* 25 F.3d at 687 (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). "The ability to prepare meals for dependents, occasionally visit with friends, watch TV, and read does not qualify as the ability to do substantial gainful activity ... and cannot reasonably be characterized as 'a great deal of physical activity.'" *Payton,* 25 F.3d at 687 (citing *Thomas,* 876 F.2d at 669).

The ALJ claims that Alverio's chores are inconsistent with her allegations of pain. Alverio stated that she vacuums alone for approximately twenty minutes or until she feels sharp pain in her back, and then she rests. In addition, she shops at the grocery store and does the laundry with assistance. This short list of chores, one of which is done with assistance, cannot reasonably be characterized as a great deal of physical activity, nor can it necessarily discredit the pain she feels in her right trigger finger and her left hand. Furthermore, Alverio's alleged "earlier" activities of window washing, embroidery, and card playing are noted in "Exhibits 3 and 6." (Tr. 19.). However, Alverio's accounts of doing these activities appear in an undated supplemental disability report, (Tr. 134.), and not in another report, which has the date March 14, 1992, handwritten at the top of the report. (Tr. 155.). Based on a review of these reports, the court infers it is likely Alverio filed the undated report before the dated report because in the dated report, she refers to her condition as worsening. (Tr. 155.). Furthermore, based on this inference, Alverio filed these reports before the onset of her right trigger finger injury in July 1992. The ALJ has a duty to fully and fairly develop the record. *See Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994). He should not

have based his credibility analysis on the alleged inconsistencies between Alverio's responses on the supplemental disability forms without inquiring as to the dates of both forms so he could conduct a comparison of the dates of Alverio's alleged injuries. Based on the record as it stands, the court is not convinced that Alverio's daily activities are in fact inconsistent with at least her complaint of a disabling right trigger finger.

### b. Alleged inconsistencies regarding Alverio's medical treatment

The ALJ alleged Alverio's treatment is inconsistent with her allegations of disabling impairments because she takes only Ibuprofen[5] to deal with her headaches and musculoskeletal pain and Amitriptyline[6] to deal with her depression and sleeping difficulties. (Tr. 19.). However, Alverio indicated that Glynase, a diabetic medication, has been prescribed for her since at least November 17, 1992. (Tr. 19.). Furthermore, the ALJ noted that Alverio did not follow her recommended diet to control her diabetes and only wore a cervical collar and finger splint as needed. (Tr. 19.).

Alverio, however, alleges that she can no longer afford medical treatment because on December 26, 1991, she exhausted her Rural Outreach amount which she used for her medical bills. (Tr. 194.). Therefore, it is logical to conclude that she could not afford Glynase or other medications after December 26, 1991. Furthermore, each doctor who saw and subsequently diagnosed Alverio noted her lack of concentration. Specifically, Dr. Karayusuf questioned her ability to follow and meet the requirements of vocational rehabilitation. In addition, Joey Van Zomeran noted that Alverio has poor concentration skills, in that she needs verbal prompting for basic activities and cannot stay on a task for longer than fifteen to twenty minutes. Alverio's inability to follow a recommended diet for her diabetes could be attributed to her

---

**5.** Ibuprofen is defined as "an anti-inflammatory agent." Stedman's Medical Dictionary 845 (26th ed. 1995).

**6.** Amitriptyline is an antidepressant agent with mild tranquilizing properties, used in the treat-

ment of mental depression and in the depressive phase of manic-depressive states; sometimes used in the treatment of sleep disorders. Stedman's Medical Dictionary 61 (26th ed. 1995).

deficiencies in concentration, initiative, and judgment.

Furthermore, because the ALJ concedes and the court agrees that Alverio's primary impairment is a mental one, the fact that Alverio is not taking many types of medication for her physical ailments is not necessarily indicative that there are inconsistencies between Alverio's treatment and her alleged impairments. Dr. Mahoney validates this conclusion in the record, indicating that Alverio's mental problems make her multiple somatic complaints difficult to "sort out" for treatment. (Tr. 260.). Also, Dr. Karayusuf has suggested that Alverio receive outpatient psychiatric care and medication, but as mentioned, Alverio has exhausted her Rural Outreach amount which enabled her to pursue such a course of treatment. Therefore, the court finds there is no substantial evidence indicating any inconsistencies between Alverio's treatment and her alleged impairments.

### c. Alleged inconsistencies regarding Alverio's work history

The ALJ alleges Alverio's work history is not consistent with her allegations of disabling impairments. The ALJ notes that "[a]lthough [Alverio] alleges she was terminated from chicken deboning and laundering jobs due to her inabilities to concentrate, perform at pace, and tolerate stress, her inability to perform these positions says nothing about her abilities to perform less physically strenuous and less mentally stressful and pressured work." (Tr. 19.).

This characterization of Alverio's work history ignores additional episodes in her work history that indicate her disabling inability to concentrate or exercise judgment in the workplace. Alverio has also alleged she was terminated from Marshal & Swift and Subway due to lack of concentration. In fact, at Subway, Alverio inadvertently cut her hand with a knife without even realizing she had done so, allegedly due to her inability to concentrate on the task at hand. Furthermore, Alverio alleges being terminated from other positions shortly after being hired due to her inability to concentrate on even the smallest, most simplistic tasks. In addition, Alverio's testimony is supported by the testi-

mony of Joey Van Zomeran, who testified at the hearing regarding Alverio's activities at the RENEW Center and, among other matters, Alverio's inability to concentrate on tasks for longer than fifteen to twenty minutes. Therefore, the court finds no substantial evidence indicating an inconsistency between Alverio's work history and her allegations of disabling impairments.

In addition, the Secretary argues in its brief that because Alverio was receiving unemployment insurance benefits at the time she filed her application for social security disability insurance benefits, this fact adversely affects Alverio's credibility. In *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir.1991), the court found that Jernigan's application for unemployment compensation benefits adversely affected his credibility regarding his application for social disability benefits as well. However, the court also noted that filing for unemployment compensation benefits is not necessarily conclusive to negate a claim for disability, and in another Eighth Circuit decision, the court was not persuaded such an application for unemployment adversely affected the plaintiff's credibility. *See Spencer v. Bowen*, 798 F.2d 275, 278 (8th Cir.1986) (finding the plaintiff's simultaneous search for work and to obtain social security disability benefits alone cannot support a finding of lack of credibility). The court here is similarly persuaded that Alverio's simultaneous receipt of unemployment insurance benefits and application for social security disability benefits should not necessarily negate her claim for benefits or indicate a lack of credibility on her part. Therefore, the court finds this alleged inconsistency argued by the Secretary does not negate Alverio's claim of disability or indicate substantial evidence of her lack of credibility.

### 3. The credibility of Joey Van Zomeran

In addition to finding Alverio's subjective complaints not credible, the ALJ also discounted the testimony of Joey Van Zomeran, director of the RENEW Center, as not credible. The ALJ disregarded her testimony because Van Zomeran allegedly admitted she "barely knew" Alverio, and rather knew her only through completion of the paperwork

referring her to the RENEW Center. (Tr. 20.). Although the ALJ acknowledged Van Zomeran's testimony regarding Alverio's sporadic attendance, her problems staying on task, and her productivity, Van Zomeran's alleged admission caused the ALJ to discredit her testimony.

The court does not dispute that the Secretary is permitted to discount the credibility of witnesses in a disability determination. *Rappoport v. Sullivan,* 942 F.2d 1320, 1322–23 (8th Cir.1991). Furthermore, under *Perales,* the court's review of the ALJ's conclusions is limited. *Perales,* 402 U.S. at 401, 91 S.Ct. at 1427. "If both parties met their burdens and the decision of the ALJ is rationally based upon the substantial evidence cited in support thereof, then [this court] must give conclusive effect to the ALJ. [I am] not permitted to substitute [my] opinion for that of the ALJ, even if [I] might have reached a different result on the basis of the evidence." *Gillyard v. Shalala,* NO. 93–0065, 1994 WL 52756, at *2 (E.D.Pa. Feb. 18, 1994).

Cognizant of its limited powers of review, the court nevertheless notes Van Zomeran never admitted that she "barely knew" Alverio, or that she only knew her through paperwork. Van Zomeran testified that she came to know Alverio when she was referred to the RENEW Center as a person in need of independent living skills. However, Van Zomeran did not say this initial paperwork was the only contact or only avenue through which she knew Alverio. Rather, Van Zomeran testified Alverio has been mostly involved with socialization and crafts because it is difficult for her to stay on task for more than fifteen to twenty minutes at a time, with very poor work skills. Also, Van Zomeran noted that Alverio's productivity on her projects was very poor. Van Zomeran further testified that despite Alverio's attempted involvement with craft projects, she needed verbal prompting and much supervision to complete basic, simple tasks, for example, a routine ceramics project. In addition, Van Zomeran recognized that Alverio lacks community resource skills and cannot fill out any type of papers without assistance. Also, Van Zomeran noted Alverio had a history of sporadic attendance at the RENEW Center, likely due to her inability to keep schedules. Although the ALJ asserts that his impression of Van Zomeran was that she "barely knew" Alverio, she gave a rather detailed account of Alverio's deficiencies and problems at the RENEW Center.

The reliability of this detailed account is further bolstered in the record by the acknowledgment of Alverio's lack of concentration and judgment by her physicians, Alverio's work history, and by Alverio's own testimony. Therefore, although the court's review of the ALJ's conclusions is limited, the court finds that, based on the record of her testimony, Van Zomeran did not state she "barely knew" Alverio. In addition, the court concludes Van Zomeran's testimony regarding Alverio's activities is consistent with the other evidence regarding Alverio's mental impairments in this case. Consequently, the court finds the ALJ erred when he ruled Van Zomeran's testimony, as a whole, was not credible.

### 4. The hypothetical questions

 Alverio argues the hypothetical questions posed to the vocational expert failed to include all of her impairments. An ALJ's hypothetical question must fully describe a claimant's impairments. *Chamberlain v. Shalala,* 47 F.3d 1489, 1495 (8th Cir. 1995) (citing *Shelltrack v. Sullivan,* 938 F.2d 894, 898 (8th Cir.1991)). If vocational expert testimony is based upon an insufficient hypothetical question, it "does not constitute substantial evidence to support a finding of no disability." *Id.* However, "[w]hile it is clear that 'questions posed to vocational experts .... should precisely set out the claimant's particular physical and mental impairments,' *Greene v. Sullivan,* 923 F.2d 99, 101 (8th Cir.1991), a proper hypothetical question is "sufficient if it sets forth the impairments which are accepted as true by the ALJ." *House v. Shalala,* 34 F.3d 691, 694 (8th Cir. 1994) (citing *Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985)). Therefore, the court's analysis of the sufficiency of the ALJ's hypothetical question involves a determination of whether the impairments accepted by the ALJ were appropriate.

Alverio asserts the ALJ failed to include Alverio's inability to concentrate and need for constant prompting, supervision, and reminding to complete basic tasks in his hypothetical to the vocational expert. Alverio further notes that when the inability to stay on task for a maximum of thirty minutes was added to the hypothetical, the vocational expert stated that a person who couldn't stay on task for more than thirty minutes would not be considered employable. Furthermore, when Alverio's alleged need for constant supervision, prompting, and reminding was added to the ALJ's hypothetical, the vocational expert stated, "I don't see an individual that needed constant supervision, constant reminding being competitively employed. Only in a sheltered work situation would you find that type of supervision." (Tr. 80–83.).

As noted above, Alverio's doctors all have recognized Alverio's inability to concentrate on tasks for a significant period of time. Alverio's prior work history illustrates this problem plagued her in many of the jobs she obtained. Furthermore, although the ALJ discounted the testimony of Joey Van Zomeran, the court has already concluded the ALJ erred in discrediting this witness, who attested to Alverio's inability to concentrate on tasks for more than fifteen to twenty minutes, her poor productivity, and her need for constant supervision and verbal prompting to complete simple tasks. Although Alverio has alleged other omissions from the ALJ's hypothetical, this omission alone suffices to render the hypothetical insufficient. Therefore, the hypothetical questions in this case should not be considered substantial evidence supporting a finding of no disability.

### D. Relief

Once a social security disability claimant has shown she is not able to perform her past relevant work, the burden shifts to the Secretary to show the claimant is able to do other work. *Smith v. Shalala*, 46 F.3d 45, 47 (8th Cir.1995); *Hajek v. Shalala*, 30 F.3d 89, 93 (8th Cir.1994). Here, in his decision, the ALJ stated the burden had shifted to the Secretary. (Tr. 21.) However, the Secretary has failed to meet her burden of show-

ing the existence of jobs in the national economy which Alverio could perform. Where the Secretary has not carried her burden in this respect, this is not substantial evidence to support a finding of no disability, and the court may reverse and remand with instructions to the Secretary to award benefits. *Smith*, 46 F.3d at 47. Furthermore, in cases where a hearing would simply delay receipt of benefits, the court shall reverse and award benefits outright. *See Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir.1987); *Cook v. Bowen*, 797 F.2d 687, 691 (8th Cir.1986). Therefore, because there is substantial evidence in the record indicating a finding of Alverio's disability, and no substantial evidence to support the ALJ's finding of no disability, judgment is reversed and the case is remanded with instructions to the Secretary for the payment of benefits.

### III. CONCLUSION

Based on its review of the record and the ALJ's decision, the court is not persuaded the objective medical evidence supports a finding that Alverio is not disabled. Rather, the court concludes the objective medical evidence regarding Alverio's mental impairments supports a finding that Alverio is, in fact, disabled. Furthermore, the court concludes the ALJ's credibility determinations regarding both Alverio and Joey Van Zomeran are not supported by substantial evidence as a whole. The ALJ recognized Alverio's primary impairment as a mental impairment, yet failed to raise any issues that constituted substantial evidence of a lack of disability concerning her primary impairment. The ALJ erred in finding inconsistencies where they did not exist and in excluding Alverio's inability to concentrate on tasks for longer than fifteen to twenty minutes from the vocational expert's hypothetical. Thus, the vocational expert's hypothetical, absent Alverio's prevailing deficiency, was insufficient and cannot constitute substantial evidence of a finding of no disability. For these reasons, the court concludes the total record supports a finding of Alverio's mental disability, and there is no substantial evidence in the record as a whole to support the ALJ's denial of benefits. Therefore, judgment shall be entered reversing the ALJ's decision and re-

manding this case with instructions to the Secretary to award benefits to Alverio.

**IT IS SO ORDERED.**